**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**ALVIN C. BAIRD,**

                                    **Plaintiff,**                        **1:08-cv-388**
                                                                          **(GLS/RFT)**

                    **v.**

**STATE UNIVERSITY OF NEW YORK;**
**MARGARET BENKE,** also known as
**MEG BENKE; EILEEN K. CORRIGAN;**
and **EMPIRE STATE COLLEGE,**

                                    **Defendants.**
_____

**APPEARANCES:**                              **OF COUNSEL:**

**FOR THE PLAINTIFF:**

Alvin C. Baird
Pro Se
4114 Balfern Avenue
Baltimore, MD 21213

**FOR THE DEFENDANTS:**

HON. ANDREW M. CUOMO          STEPHEN M. KERWIN
New York State Attorney General   Assistant Attorney General
The Capitol
Albany, NY 12224

**Gary L. Sharpe**
**District Court Judge**

## MEMORANDUM-DECISION AND ORDER

### I. Introduction

Pro se plaintiff Alvin C. Baird commenced this action under Title VI of the Civil Rights Act of 1964,[1] 42 U.S.C. § 1983, and New York State common law against defendants State University of New York, Meg Benke, Eileen Corrigan, and Empire State College, alleging race-based discrimination, violations of his Fourteenth Amendment rights, and negligence, all in connection with his expulsion from defendant Empire State College.  (*See* Am. Compl., Dkt. No. 21.)  Pending are defendants' motion for summary judgment, (Dkt. No. 62), and Baird's motions to strike certain evidence and for summary judgment, (Dkt. Nos. 65, 67).  For the reasons that follow, defendants' motion is granted in part and denied in part, and Baird's motions are denied.

### II. Background

Pro se plaintiff Alvin C. Baird is a 32-year-old African American who resides in Maryland.  (*See* Am. Compl. ¶ 1, Dkt. No. 21.)  From November 1999 to May 22, 2006, Baird was a student at defendant Empire State

---

[1]42 U.S.C. § 2000d, *et seq.*

College in the school's Center for Distance Learning (CDL).[2]  (*See* Def.

SMF ¶ 2, Dkt. No. 62:2; Am. Compl. at 3, Dkt. No. 21.)  During that time,

defendant Meg Benke was the Dean of the CDL, and defendant Eileen

Corrigan was Empire's Director of Student Financial Services.  (*See* Am.

Compl. ¶¶  4, 5 Dkt. No. 21.)  Empire is a state-operated institution of

defendant State University of New York (SUNY).  (*See* SUNY Resp. to

Interrog. ¶ 1, Dkt. No. 75.)

      During the period of Baird's enrollment, Empire required its students

to make "satisfactory academic progress" (SAP) in order to remain eligible

to enroll.  (*See* Def. SMF ¶ 4, Dkt. No. 62:2; Defs. Ex. 1, Benke Letter at 1,

Dkt. No. 62:10.)  SAP was defined as earning the minimum number of

credits expected for the number of terms the student was enrolled at

Empire.  (Def. SMF ¶ 4, Dkt. No. 62:2.)  SAP was determined based on a

previously-published table showing the minimum number of credits

expected for the number of terms of enrollment.  (*Id.* at ¶ 5.)  The SAP

calculation was limited to "enrollment credits," or credits earned at Empire,

──────────────

      [2]Empire is divided into eleven centers, each headed by a dean.  (*See* Elliot Decl. ¶ 1,
Dkt. No. 62:8.)  Most centers are defined by the geographic area they serve (e.g., Central New
York Center, Genesee Valley Center), though some are defined by an academic specialty or
academic level, and are not defined geographically (e.g., Center for Labor Studies, and Center
for Graduate Studies). (*See id.*)

and did not take into account "advanced standing credits,"[3] which were not earned by successfully completing Empire courses.  (*See id.* at ¶¶ 22-25.) Students failing to meet SAP would be identified by a computer run which matched the credits earned by each student with the number of semesters the student was enrolled.  (*Id.* at ¶ 6.)  For those students identified as falling below SAP, an automated letter would be generated, would be signed by the dean of the center in which the student was enrolled, and would be mailed to the student.  (*Id.* at ¶ 7.)

In July 2005, Baird was suspended from Empire for two months for sending a threatening e-mail to a faculty member.  (*Id.* at ¶ 11.)  At the time of his suspension, Baird was enrolled in a Business Ethics course. (*See id.* at ¶ 12.)  The letter notifying Baird of his suspension stated that he would be given an opportunity to complete the Business Ethics course as an independent study once his suspension was lifted.  (*See id.*)  Baird's suspension was lifted in September 2005, and Dean Benke's staff made arrangements for Baird to complete the Business Ethics course as

---

[3]"Advanced standing credits" are credits either transferred in from other regionally-accredited institutions or college-level credits brought in from sources of non-collegiate learning, such as credits earned through standardized testing or the military.  (*See* Defs. SMF ¶¶ 22-25, Dkt. No. 62:2.)  Although these credits are not considered in calculating SAP, they do apply toward a student's final degree requirements.  (*See id.*)

promised.  (*See* Defs. SMF ¶ 13, Dkt. No. 62:2; Sept. Correspondence at 1-4, Dkt. No. 62:17.)  Those arrangements included permitting Baird to use whatever work he had completed for the course prior to his suspension, and to continue the course at no additional charge.  (*See* Defs. SMF ¶¶ 31, 32, Dkt. No. 62:2.)  Baird's new instructor for the independent study was Dr. Michael Andolina.  (*See id.* at ¶ 33.)

According to defendants, Baird was advised of the course arrangements on September 28, 2005.  (*See id.* at ¶ 34.)  Specifically, defendants point to an e-mail log indicating that Empire's Catherine Combs notified Baird via voice mail and e-mail that Dr. Andolina would be his instructor for the independent study and that Baird should contact him right away to discuss the course.  (*See id.*)  Baird claims that he did not receive either of these communications.  (*See, e.g.*, Pl. Resp. Mem. of Law at 17, Dkt. No. 84.)

Dr. Andolina claims that on October 3, 2005, he "contacted [Baird] and [e-mailed] him a learning contract for the Business Ethics course," requesting that Baird "contact him to discuss [it]."  (Andolina Decl. ¶ 4, Dkt. No. 62:7.)  Dr. Andolina further claims that Baird "did attempt to contact [him] on October 3, 2005 but [that he] was unable to take his call due to

[his] involvement in another telephone call at the same time." (*Id.*)

According to Dr. Andolina, he "had no further communication with [Baird]

after October 3, 2005," and Baird "performed no work for the course that

was shown to [him]." (*Id.* at ¶ 5.)  Ultimately, Dr. Andolina "prepared and

filed with the [Empire] registrar a final course outcome of 'ZW'

(Administrative Withdrawal) since [Baird] had not engaged in significant

learning activities throughout the term of the course." (*Id.*)  Baird denies

ever contacting or being contacted by Dr. Andolina.  (*See, e.g.*, Pl. Resp.

Mem. of Law at 17, Dkt. No. 84; Baird Dep. at 62, Dkt. No. 62:33.)

On October 13, 2005, Dean Benke sent Baird a letter advising him

that he was in "academic dismissal," explaining that he had earned only

ninety credits when he should have earned ninety-four, and that the

dismissal made him ineligible for re-enrollment.  (*See* Oct. 13, 2005 Letter

at 1, Dkt. No. 62:15.)  Subsequently, however, Dean Benke reconsidered

the dismissal and placed Baird on "extended academic warning" (EAW),[4]

apparently because Baird was very close to completing his degree

requirements.  (*See* Defs. SMF ¶¶ 19-21, Dkt. No. 62:2.)  In an October 18,

---

[4]Empire's SAP policy allowed a dean to reconsider an SAP dismissal and recommend
an extra enrollment with the student in EAW.  (*See* Defs. SMF ¶ 19, Dkt. No. 62:2.)  EAW is an
exception made on behalf of a student while the student is not in good progress.  It allows the
student to re-enroll while an SAP dismissal does not.  (*See id.*)

2005 letter to Baird, Dean Benke repeated that Baird had fallen below the school's SAP rate, but that he was being placed on EAW.  (*See id.* at ¶ 21.) The letter further stated that failure to maintain SAP might affect his eligibility for financial aid.  (*See id.*)

On March 1, 2006, Baird contacted Dean Benke and inquired about enrolling in the Business Ethics course for the Spring March term.[5]  (*See* Defs. SMF ¶ 39, Dkt. No. 62:2.)  Dean Benke responded that Baird could enroll in the course, but that, based on her conversation with defendant Corrigan, then Director of Financial Aid Services, he would be ineligible for financial aid and that the course would cost $817.40.  (*See id.* at ¶¶ 40, 41.)  According to Corrigan, Baird did not qualify for financial aid because he did not meet the SAP requirements, a prerequisite for financial aid eligibility.  (*See* Corrigan Decl. ¶ 4, Dkt. No. 62:6.)  Corrigan explained this to Baird in a May 17, 2006 letter, and notified him that his financial aid had been cancelled.  (*See* May 17, 2006 Letter, Dkt. No. 62:32.)

On March 6, 2006, Baird responded to Dean Benke by e-mail, stating that the Federal Student Aid Program (FAFSA) informed him that he was eligible for financial aid.  (*See* Defs. SMF ¶ 43, Dkt. No. 62:2.)  The

---

[5]CDL has five terms per year beginning in September, November, January, March, and May.  (Defs. SMF ¶ 39 n.3, Dkt. No. 62:2.)  Each term is fifteen weeks long.  (*Id.*)

message went on to accuse Dean Benke of being vindictive toward him,

attributing her vindictiveness to "[e]vil, bad-mindedness, paganism and

spiritual wickedness."  (Mar. 6, 2007 E-mail, Dkt. No. 62:20.)  Further, in

observing that Dean Benke was of Irish heritage, Baird stated that

vindictiveness was in the Irish blood and the fabric of Irish culture; that

Dean Benke was inherently evil; and that she wanted to infect everyone

with her "IRA ideology."  (*See id.*)  The e-mail concluded with the following

statements:

> Your on a sinking ship and don't even realize it. Your days are
> number [sic] at your position. I am going to shame you,
> [Empire] and when I am finished with you, you will not be able
> to eat.  Just like Jackkkkkkkkkk Abramoff. Trust me. It's
> personal and its not about business ethics. You'll see.

*(Id.)*  Finding "[Baird's] message to be threatening and harassing," and

"[a]ware that [Baird] had twice been warned to be more appropriate in his

communication with [Empire] staff,"[6] Dean Benke filed a complaint against

Baird, charging that the "communication violated the terms of the college's

student conduct policy."  (Benke Decl. ¶ 14, Dkt. No. 62:5.)

　　　Soon after the filing of the complaint, Carol Zajac, Dean of the

_____

[6]In addition to being suspended for sending a threatening e-mail in 2005, Baird was also issued a written warning by Dean Benke in November 2003 for using inappropriate language in an e-mail to a faculty member.  (*See* Defs. SMF ¶ 3, Dkt. No. 62:2.)

Northeast Center, assumed the role of judicial officer and oversaw the process of adjudicating Dean Benke's complaint.[7]  (*See id.* at ¶ 15.)  On March 30, 2010, acting pursuant to Empire's Student Conduct Policy and Procedures, Dean Zajac determined that Dean Benke's allegation fell within the scope of the Policy on Student Conduct, and was serious enough to potentially warrant a sanction of suspension or expulsion.  (Defs. SMF ¶ 51, Dkt. No. 62:2.)  As a result of her determination, Dean Zajac referred the matter to a Student Conduct Committee consisting of two CDL faculty members and a CDL student.  (*Id.* at ¶ 52.)  The committee was responsible for holding a hearing on Dean Benke's allegation within thirty days, and for providing a written decision and rationale to Baird, Dean Benke, and Dean Zajac.  (*Id.* at ¶ 53.)  Dean Zajac sent Baird a copy of Dean Benke's complaint, as well as a copy of Empire's procedures concerning student conduct, and notice that the matter was being referred to the committee.  (*Id.* at ¶ 54.)

The Student Conduct Committee held the required hearing on April 26 and May 12, 2006.  (*Id.* at ¶ 55.)  Dean Benke testified on the first day of

---

[7]While Empire policy generally required the dean of the center from which a complaint arose to serve as judicial officer, Dean Benke removed herself from that position in this instance since she was the one who filed the complaint.  (*See* Benke Decl. ¶¶ 15-16, Dkt. No. 62:5.)

the hearing.  (*Id.* at 56.)  Baird was not present for Dean Benke's

testimony, but participated by telephone on the second hearing date.  (*Id.*

at ¶¶ 57, 58.)  Prior to his participation, Baird was advised that he was

entitled to have an advisor assist him at the hearing, and that he could

refuse to answer questions—rights which were also specified in the written

procedures previously provided by Dean Zajac.  (*Id.* at ¶ 59.)  Baird waived

those rights and testified before the committee.  (*Id.* at ¶ 60.)

Following the hearing, the committee issued its report and

recommendation to Dean Zajac, which stated:

> Mr. Baird's inability to control his behavior or appreciate, even
> now, that it was wrong makes it unlikely that he will refrain from
> similar conduct in the future. Therefore, to protect      members
> of the college community from such threats of harassment and
> intimidation in the future, the committee concludes that the
> appropriate sanction is expulsion.

(*Id.* at ¶ 62.)  Dean Zajac concurred with the committee's recommendation

and found expulsion to be the appropriate sanction.  (*Id.* at ¶ 63.)  In a

letter dated May 22, 2006, Dean Zajac informed Baird of the committee's

recommendation, provided him with a copy of its report, and explained that

she concurred with the recommendation and that he was therefore

expelled from the college.  (*Id.* at ¶ 64.)  The letter further advised Baird of

10

his right to submit a written appeal to Empire's Provost/Vice President for Academic Affairs within thirty days.  (*Id.* at ¶ 65.)

In June 2006, Baird submitted an appeal of the expulsion determination to Provost Joyce E. Elliot, contending that Dean Benke "had a vendetta for [him]," and that she "provoked this entire incident" by sending him the October letters about his SAP status, which he maintained were "inaccurate."  (Appeal Letter at 1, Dkt. No. 62:27.)  Baird also took issue with the procedures used by the Student Conduct Committee, alleging that the committee members were partial in their decision since they were Dean Benke's subordinates, and that their "decision could have been motivated by fear of their 'master.'" (*Id.* at 2.)

On July 31, 2006, Provost Elliot denied Baird's appeal, explaining that, upon review of the "process and the information considered in relation to [Baird's] case," the committee "followed the procedures outlined in the Student Conduct Policy and Procedures."  (Appeal Denial, Dkt. No. 62:28.) Provost Elliot further noted that "when [Baird] did not participate in the hearing scheduled for April 26, 2006, [he was] given a second opportunity to be heard on May 12, 2006."  (*Id.*)  Ultimately, Provost Elliot "uph[e]ld the determination of responsibility and the sanction of expulsion."  (*Id.*)

11

On March 31, 2008, Baird commenced this action in the United

States District Court for the District of Maryland, invoking the court's

jurisdiction under 28 U.S.C. § 1332.  (Dkt. No. 1.)  On April 9, 2008, the

case was transferred to this court.  (Dkt. No. 4.)  Broadly construed, Baird's

amended complaint alleges violations of Sections 601 and 602 of Title VI of

the Civil Rights Act of 1964 and the Fourteenth Amendment, and also

asserts claims for common law negligence.  (*See* Am. Compl., Dkt. No.

21.)  Baird seeks both monetary damages and injunctive relief.  (*See id.* at

6.)

On February 24, 2009, this court dismissed Baird's Section 602

claims in their entirety, as well as his Section 601 claims against

defendants Benke and Corrigan, and his negligence claims against Empire,

SUNY and Benke and Corrigan in their official capacities, leaving in tact his

Fourteenth Amendment claims against all defendants, his Section 601

claims against Empire and SUNY, and his negligence claims against

Benke and Corrigan in their individual capacities.  (*See* Dkt. No. 25.)

Following discovery, defendants moved for summary judgment on these

remaining claims.  (Dkt. No. 62.)  In response, Baird sought to strike certain

evidence, (Dkt. No. 65), and cross-moved for summary judgment, (Dkt. No.

67).

## III. __Standard of Review__

The standard for judgment pursuant to Rule 56 of the Federal Rules

of Civil Procedure is well established and will not be repeated here.  For a

full discussion of the standard, the court refers the parties to its previous

opinion in *Bain v. Town of Argyle,* 499 F. Supp. 2d 192, 194-95 (N.D.N.Y.

2007) (Rule 56).  As relevant to the current motion, "courts must construe

pro se pleadings broadly, and interpret them to raise the strongest

arguments that they suggest," especially where civil rights violations are

alleged.  *See Cruz v. Gomez*, 202 F.3d 593, 597 (2d Cir. 2000) (internal

quotation marks, citations, and italics omitted).

## IV. __Discussion__

### A.    __Motion to Strike__

Baird requests that the court strike certain evidence from the record.

(Dkt. No. 66.)  Because the court has not relied on the challenged evidence

in resolving the motions currently before it, the motion is denied as moot.

And insofar as Baird is attempting to preclude defendants from using the

evidence at trial, that attempt is denied as premature.

### B.    __Title VI__

Section 601 of Title VI of the Civil Rights Act of 1964 provides that "[n]o person in the United States shall, on the grounds of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."  42 U.S.C. § 2000d.  The statute prohibits only intentional discrimination.  *Alexander v. Sandoval*, 532 U.S. 275, 280 (2001) ("[I]t is ... beyond dispute ... that § 601 prohibits only intentional discrimination."); *N.Y. Urban League, Inc. v. New York*, 71 F.3d 1031, 1036 (2d Cir. 1995) (same).

Here, Baird claims that Empire and Suny violated Title VI through the allegedly unlawful conduct of their employees and by failing to intervene or properly address that conduct.  (*See* Am. Compl. at 5-6, Dkt. No. 21; Pl. Mem. of Law at 18-23, Dkt. No. 67.)  Specifically, Baird contends that "Empire through its senior officials Joseph B. Moore, Margaret Benke, and Eileen K. Corrigan abused their powers by wrongfully singling out the plaintiff because of race, wrongfully denying the plaintiff federal financial aid because of his race, [and] creating rules to subject the plaintiff to policies that only apply to him and not the other members of the school." (Pl. Mem. of Law at 20, Dkt. No. 67.)  Baird also claims that Empire "had

14

many opportunities to intervene into ... this matter and ensure that the plaintiff received fair treatment." (*Id.*)  As against SUNY, Baird contends that SUNY "allow[ed] plaintiff to be subjected to discrimination at Empire, refus[ed] to investigate the plaintiff's claim of race based discrimination, [and did] not properly investigat[e] to consider whether Empire and their faculty members involved in this matter were lying." (*Id.* at 23.)  These claims must fail.

First, as defendants correctly argue, "[l]iability under Title VI, which parallels that of Title IX, cannot be imputed to institutions based on the actions of their employees." *Goonewardena v. New York*, 475 F. Supp. 2d 310, 328 (S.D.N.Y. 2007) (citing *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 287-88 (1988)); *Bary v. Delta Airlines, Inc.*, No. CV-02-5202, 2009 WL 3260499, at *7 n.7 (E.D.N.Y. Oct. 9, 2009) (same).  Thus, to the extent Baird seeks to hold SUNY and Empire liable for the conduct of defendants Benke or Corrigan, or any other employee, those claims are dismissed.

And second, Baird's remaining allegations—that Empire and SUNY failed to properly "intervene" or remedy the allegedly discriminatory conduct—likewise fail to provide Baird with an actionable basis for Title VI

15

relief.  While "an educational institution may be liable under Title VI if it is 'deliberately indifferent' to racial harassment to such an extent that the indifference can be seen as racially motivated," *Rodriguez v. N.Y. Univ.*, No. 05 Civ. 7374, 2007 WL 117775, at *6, (S.D.N.Y. Jan. 16, 2007) (citations omitted), the record is devoid of any facts that could support such a theory.  To establish Title VI liability based on "deliberate indifference," Baird would have to show that SUNY or Empire "(1) had actual knowledge of, and (2) was deliberately indifferent to (3) harassment that was so severe, pervasive and objectively offensive that it (4) deprived [him] of access to the educational benefits or opportunities provided by the school." *Id.* (citations omitted).  Baird cannot make that showing.

At the threshold, there is no evidence that Baird was the victim of any race-based harassment or mistreatment, much less harassment or mistreatment that was "severe, pervasive and objectively offensive." Specifically, while Baird alleges a belief that defendants Benke and Corrigan mistreated and denied him educational benefits *on the basis of his race*, he offers no explanation for that belief or any facts that would

16

support even an inference of race-based discrimination.[8]  The record is

also devoid of proof that SUNY or Empire had any reason to suspect that

Baird was, or believed himself to be, the victim of severe and pervasive

racial harassment.  In arguing to the contrary, Baird points to two letters:

one written to Empire President Joseph Moore on October 31, 2005,

and another written to SUNY Chancellor John Ryan and others on May 26,

2006.  (*See* Oct. 31, 2005 & May 26, 2006 Letters, Pl. Exs. 33 & 34, Dkt.

No. 67:1.)  However, while these letters complain about Baird's

experiences with defendant Benke and his academic dismissal, expressing

strong dissatisfaction with each, neither letter complains about race-based

harassment or mistreatment. (*See id.*)  The closest either letter comes to

implicating race is Baird's statement in the October 31 letter that "Mrs.

Benke may feel that she's spited this 'nigger,' and got the best of me, but in

a short minute she'll she that I gave her a long rope to hang herself."  (*See*

May 26 Letter, Pl. Ex. 34, Dkt. No. 67:1.)  But this statement alone gives no

reasonable indication that Baird was or believed himself to be the victim of

---

[8]Indeed, the only race- or ethnicity-based harassment evident in the record is that
directed at Dean Benke by Baird in the March 6, 2006 e-mail, which attacks the Irish heritage
and culture.  (*See* Mar. 3, 2006 E-mail, Dkt. No. 62:20.)

severe and pervasive racial harassment, especially given the hostile tone of the letter and the absence of any other race-related statements. Thus, absent any evidence that Baird was the victim of severe race-based harassment, or that SUNY or Empire had actual knowledge that any such harassment occurred or was occurring, there is no basis upon which a Title VI "deliberate indifference" claim could be asserted against SUNY or Empire.

Accordingly, because Baird cannot establish any basis of Title VI liability against Empire or SUNY, Baird's Title VI claims are dismissed.

## C.    **Fourteenth Amendment**

Baird also asserts claims under the Fourteenth Amendment, contending that: (1) his equal protection rights were violated when he was denied financial aid and expelled; and (2) he was deprived of procedural due process in his pre-expulsion hearing.  (*See* Pl. Mem. of Law at 23-27, Dkt. No. 67.)  These claims fail as against each defendant.

## 1.    **Equal Protection**

Baird claims that his equal protection rights were violated when he was  "expelled and denied financial aid that all other students receive" on the basis of his race.  (*See* Pl. Mem. of Law at 23-24, Dkt. No. 67.)  To

establish an equal protection claim, a plaintiff must show that: "(1) ...

compared with others similarly situated, [he] was selectively treated; and

(2) that such selective treatment was based on impermissible

considerations such as race, religion, intent to inhibit or punish the exercise

of constitutional rights, or malicious or bad faith intent to injure a person."

*LeClair v. Saunders*, 627 F.2d 606, 609-610 (2d Cir. 1980) (citation

omitted).  Here, as discussed above, there is absolutely no evidence that

any defendant's conduct was in any way motivated by or based on Baird's

race, and the record is likewise devoid of any evidence suggesting that

Baird was treated differently than similarly-situated non-minority students.

Accordingly, Baird's equal protection claims are dismissed.

**2.     Due Process and Eleventh Amendment Immunity**

Baird's remaining due process claims against SUNY, Empire, and

Benke and Corrigan in their official capacities are barred by the Eleventh

Amendment.  The Eleventh Amendment shields states and their agencies,

departments, and officials in their official capacities from suit in federal

court, regardless of the relief sought.  *See Papasan v. Allain*, 478 U.S. 265,

276 (1986).  This immunity gives way in only three circumstances: (1)

where it is waived by the state, *see Kentucky v. Graham*, 473 U.S. 159,

169 (1985); (2) where it has been abrogated by Congress, *see id.*; and (3) where a state official is sued in her official capacity for prospective injunctive relief, *see Ex parte Young*, 209 U.S. 123, 157 (1908).

Here, in bringing suit against SUNY and Empire—a state-operated institution of SUNY—Baird has, for Eleventh Amendment purposes, sued New York State. *Dube v. State Univ. Of N.Y.*, 900 F.2d 587, 594 (2d Cir. 1990). ("For Eleventh Amendment purposes, SUNY is an integral part of the government of the State of New York and when it is sued the State is the real party." (citation and internal quotation marks omitted)). The same is true of Baird's suit against Benke and Corrigan in their official capacities. *See Papsan*, 478 U.S. at 276. The only remaining question, then, is whether one of the three exceptions to sovereign immunity apply in this case. In that regard, it is clear that neither SUNY nor Empire has waived its Eleventh Amendment protection, and that § 1983, the vehicle employed to sue defendants here, does not abrogate that protection. *See Dube*, 900 F.2d at 594 (explaining that it is "well settled" that § 1983 does not abrogate Eleventh Amendment immunity). The third exception, the *Ex parte Young* exception, is, for the reasons explained below, also inapplicable here.

As described above, the *Ex parte Young* exception to a state official's entitlement to Eleventh Amendment immunity "permits suits for prospective injunctive relief against state officers alleged to have acted in violation of federal law." *Schallop v. N.Y. State Dep't of Law*, 20 F. Supp. 2d 384, 391 n.6 (N.D.N.Y. 1998) (citation omitted).  This exception, however, applies only where the official sued has "some connection with the enforcement of the [allegedly unconstitutional] act." *Ex parte Young*, 209 U.S. 123, 157 (1908); *see also Marshall v. Switzer*, 900 F. Supp. 604, 615 (N.D.N.Y. 1995) (explaining that the state official must have "a direct connection to, or responsibility for, the alleged illegal action" (citation omitted)).  In this case Baird seeks injunctive relief in the form of an order requiring Empire to "readmit [him] to complete the four credits to complete his bachelors degree and graduate" because he was expelled without being afforded adequate due process in his pre-expulsion hearing.  (*See* Am. Compl. at 6, Dkt. No. 21.)  Therefore, to be stripped of Eleventh Amendment protection here, Benke or Corrigan must have had some connection with the enforcement of Baird's expulsion without due process—the alleged unconstitutional act.  However, Baird fails to allege that connection, and the record fails to otherwise suggest it.  Specifically,

neither defendant was in any way responsible for supervising the hearing committee; for overseeing the hearing or how it proceeded; for analyzing or adopting the committee's expulsion recommendation; for handling, weighing in on, or deciding Baird's appeal; for making any recommendation as to Baird's expulsion; or for playing any role in Provost Elliot's ultimate decision to expel Baird.  Moreover, Baird does not allege that either defendant has the authority to perform the relief sought and reinstate him to Empire.  *See Hall v. Marshall*, 479 F. Supp. 2d 304, 318 (S.D.N.Y. 2007) (dismissing claims against state officials in absence of allegation that they had authority to perform the injunctive relief sought); *see also Loren v. Levy*, No. 00 Civ. 7687, 2003 WL 1702004, at *11 (S.D.N.Y.  Mar. 31, 2003) ("An injunction may issue only in circumstances where the state official has the authority to perform the required act." (citation and internal quotation marks omitted)). Therefore, the *Ex parte Young* exception does not apply under these circumstances.  To hold otherwise would be to permit Baird to effectively sue New York State through its agents and circumvent the state's sovereign immunity.  *See Johnson v. N.Y. State Dep't of Corr. Servs.*, 709 F. Supp. 2d 178, 183 (N.D.N.Y. 2010).

Accordingly, absent the applicability of any exception to defendants'

Eleventh Amendment immunity, Baird's procedural due process claims against SUNY, Empire, and Benke and Corrigan in their official capacities are dismissed.

### 3.    Remaining Individual Capacity Claims

To the extent that Baird is also asserting his procedural due process claims against Benke and Corrigan in their individual capacities, those claims must also fail.  Baird alleges that he was deprived of procedural due process during his pre-expulsion hearing because the hearing committee was "not impartial," and because he was unable to confront or cross-examine defendant Benke.  (*See* Pl. Mem. of Law at 23-27, Dkt. No. 67.) However, because neither Benke nor Corrigan were responsible for providing Baird with the process he was due, and because there is no evidence or allegations that either defendant was in any way responsible for tainting or compromising the integrity of Baird's pre-expulsion hearing, the court agrees with defendants that neither Benke nor Corrigan can be held responsible for any deficiencies in that hearing.  *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) ("It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." (citation and internal

quotation marks omitted)).  Accordingly, Baird's procedural due process claims against defendants Benke and Corrigan in their individual capacities are dismissed.

**D.    Negligence**

Baird's remaining claims are for negligence against both Benke and Corrigan in their individual capacities.

Baird's first contention in this regard relates to the letters sent by Benke and Corrigan in October 2005 and May 2006.  As against Benke, Baird claims that she was negligent in sending him the October 13, 2005 letter, which dismissed him from Empire for not achieving SAP, and the October 18, 2005 letter, which reiterated his SAP deficiency but placed him on EAW.  (*See* Pl. Resp. Mem. of Law at 16, Dkt. No. 84.)  As against Corrigan, Baird claims that she was negligent in sending him the May 17, 2006 letter notifying him that his financial aid was being cancelled because of his failure to satisfy Empire's SAP standards.  (*See id.* at 19-25.)  Baird argues that both defendants were negligent in sending these letters because the letters were premised on the "inaccurate" and "fabricated" conclusion that he had not earned enough credits to satisfy the SAP requirements.  (*See id.* at 16-25.)  Defendants argue that Baird's

negligence claims cannot survive on this basis because the letters were not inaccurate.  The court agrees.

The record demonstrates that Empire's SAP policy was aimed at monitoring a student's academic progress per semester, limiting its consideration to only those credits earned through courses taken at Empire.  As of October 13, 2005, while Baird had accumulated 120 total credits toward his degree, only ninety of those credits were earned at Empire.  (*See* Transcript, Pl. Ex. 6, Dkt. No. 67:1.)  Thus, because Empire's SAP policy required Baird to have earned ninety-four credits by that time, there is no basis to conclude that the October 13 and 18 letters communicating that fact were "inaccurate" or "fabricated."  The same is true of the May 17, 2006 letter sent by defendant Corrigan.  As indicated in that letter, financial aid eligibility hinged on a student's compliance with Empire's SAP requirements.  (*See* May 17, 2006 Letter, Dkt. No. 62:32; *see also* Pl. Ex. 28, Empire Eligibility for Financial Aid Sheet, Dkt. No. 67:1.)  Therefore, since Baird's academic progress fell below SAP standards, Corrigan's letter informing him that he was no longer eligible for financial aid cannot be viewed as "inaccurate" or "fabricated."  Accordingly, Baird's negligence claims must fail insofar as they are based on the letters

sent by Benke and Corrigan.  And because the May 17, 2006 letter is the

only basis upon which Baird asserts a  negligence claim against defendant

Corrigan, that claim is dismissed.

Baird's remaining theory of negligence is based on his contention

that, after his 2005 suspension, he "never knew that their [sic] was a

Business Ethics course for him to take," attributing this to Benke's "careless

handling of informing Baird about [the] course," (Pl. Resp. Mem. of Law at

9, Dkt. No. 84), and her failure to personally "tell[] him to contact Mike

Andolina to finish [the] course," (Pl. Mem. of Law at 11, Dkt. No. 67).

Based on this alleged negligence, Baird claims that Benke deprived him of

the opportunity to finish the Business Ethics course, ultimately leading to

his October dismissal and the cancellation of his financial aid.  (*See* Pl.

Resp. Mem. of Law at 9-10, Dkt. No. 84.)

In seeking summary judgment on this claim, Benke offers nothing in

the way of a focused negligence analysis—or any analysis for that

matter—instead arguing in two sentences that she cannot be liable for

negligence because "[w]hatever action or inaction [she] took or did not take

with regard to [Baird], she did intentionally."  (Defs. Mem. of Law at 23, Dkt.

No. 62:3).  This argument—apparently aimed at transforming the

negligence claim into one for a time-barred intentional tort[9]—is underdeveloped, fails to squarely address Baird's allegations, and is therefore insufficient to warrant summary judgment.[10]

The only other challenge to Baird's negligence claim is asserted in Benke's opposition to Baird's cross-motion for summary judgment.  There, Benke points to the evidence indicating that her staff took efforts to notify Baird of the arrangements made as to the Business Ethics Course and to provide him with Dr. Andolina's contact information, apparently arguing that she acted reasonably under the circumstances.  (*See* Def. Resp. Mem. of Law at 10, Dkt. No. 71.)  As noted, this argument is not asserted in support of Benke's motion for summary judgment.  However, even if the court were to consider the argument as though it were, it would not entitle her to judgment at this juncture.

---

[9]As the court explained in its February 24, 2009 Memorandum-Decision and Order, "[i]nsofar as Baird's amended complaint could be construed as also asserting state common law claims for intentional torts, such claims are clearly barred by a one year of statute of limitations under C.P.L.R. 215(3), as the events at issue occurred no later than 2006 and this action was filed in 2008."  (Feb. 24, 2009 Memorandum-Decision & Order at 9 n.3, Dkt. No. 25.)

[10]The court also denies Benke's request that it decline to exercise its supplemental jurisdiction over Baird's negligence claim.  (*See* Defs. Mem. of Law at 23, Dkt. No. 62:3.)  While all of Baird's federal claims have been dismissed, the court finds that permitting the remaining negligence claim to survive at this late stage of the litigation would best serve the interests of "judicial economy, convenience, [and] fairness."  *See Klein & Co. Futures, Inc. v. Bd. of Trade*, 464 F.3d 255, 262-63 (2d Cir. 2006) (citation omitted).

Most fundamentally, whether a defendant acts reasonably under the circumstances generally gives rise to questions of fact for a jury.  *See Gonzales v. Caballero*, 572 F. Supp. 2d 463, 467 (S.D.N.Y. 2008).  This case is no exception.  In his submissions, Baird denies ever receiving the voice mail and e-mail allegedly sent to notify him of the availability of the Business Ethics course.  Given this denial and the absence of any proof definitively refuting it, there is at least some question as to whether the extent of Benke's efforts to notify Baird were sufficient given whatever duty she owed Baird under the circumstances.[11]  Thus, because the facts and arguments as currently presented are insufficient to permit the court to hold that the extent of Benke's efforts to notify Baird was sufficient as a matter of law, Benke's motion for summary judgment is denied as to this claim.

**E.**   **Baird's Cross-Motion for Summary Judgment**

Baird's cross-motion for summary judgment is a near-identical recitation of the arguments made in his opposition to defendants' motion for summary judgment.  (*Compare* Pl. Resp. Mem. of Law, Dkt. No. 84, *with* Pl. Mem. of Law, Dkt. No. 67.)  Having found none of these arguments

───────────────────

[11]Although the threshold question in any negligence action is whether and to what extent the defendant owed a duty of care to the plaintiff, *Hamilton v. Beretta U.S.A. Corp.*, 96 N.Y.2d 222, 232 (N.Y. 2001), Benke does not address the duty issue and therefore fails to offer any guidance as to the precise contours of the duty owed by Benke.

sufficient to defeat defendants' motion as to Baird's claims under Title VI, the Fourteenth Amendment, or his negligence claim based on the October and March letters, the court finds that they are also insufficient to entitle Baird to summary judgment.  As to Baird's remaining claim for negligence against Benke, the court has already determined that questions of fact remain and therefore denies Baird's motion for summary judgment as to that claim.  Accordingly, Baird's cross-motion for summary judgment is denied.

### V.  <u>Conclusion</u>

**WHEREFORE**, for the foregoing reasons, it is hereby

**ORDERED** that defendants' motion for summary judgment (Dkt. No. 62) is **DENIED** as to Baird's negligence claim against Benke insofar as it is based on her alleged failure to sufficiently notify Baird of the availability of the Business Ethics Course; and it is further

**ORDERED** that defendants' motion for summary judgment (Dkt. No. 62) is **GRANTED** in all other respects; and it is further

**ORDERED** that Baird's motion to strike certain evidence (Dkt. No. 65) is **DENIED**; and it is further

**ORDERED** that Baird's cross-motion for summary judgment (Dkt. No.

67) is **DENIED**; and it is further

ORDERED that the Clerk provide a copy of this Memorandum-

Decision and Order to the parties.

**IT IS SO ORDERED.**

November 17, 2010
Albany, New York

United States District Court Judge